UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOHN KELSEY and TIMOTHY WRIGHT,
both individually and on behalf of a class of
others similarly situated,

                      Plaintiffs,

   -against-                                1:04-CV-299
                                           (LEK/DRH)

THE COUNTY OF SCHOHARIE,
JOHN S. BATES, JR., both individually
and in his official capacity as Sheriff of the
County of Schoharie, and JIM HAZZARD,
both individually and in his capacity as
Administrator of the Schoharie County Jail,

                      Defendants.

## MEMORANDUM-DECISION AND ORDER

      Plaintiffs John Kelsey ("Kelsey") and Timothy Wright ("Wright") (collectively

"Plaintiffs") filed suit, individually and on behalf of others similarly situated, alleging that the

Schoharie County Sheriff's Department ("SCSD") has an unconstitutional policy and/or practice

of strip searching all individuals, including those charged with misdemeanors or held on civil

matters, who enter the Schoharie County Jail ("SCJ") regardless of the crime with which they are

charged.  Compl. (Dkt. No. 1) at ¶ 1.  Plaintiffs assert that Defendants John S. Bates, Jr.

("Bates"), Schoharie County Sheriff, and Lieutenant Jim Hazzard ("Hazzard"), SCJ

Administrator, (collectively, with Schoharie County, "Defendants") promulgated the written

procedures that govern the complained-of practices.  Id.

1

Presently before the Court are two motions: (1) Plaintiffs' Motion that the Court certify this action as a class action, Dkt. No. 46, and (2) Defendants' Motion for summary judgment pursuant to Rule 56 of the *Federal Rules of Civil Procedure*, Dkt. No. 47. For the following reasons, the Court denies Defendants' Motion for summary judgment and certifies Plaintiffs' proposed class.

## I.      Background

### A.      Facts Related to SCJ's Policies and Practices

SCJ is operated by the SCSD. Defts' Statement of Material Facts (Dkt. No. 48) at ¶ 1. Plaintiffs and Defendants agree that after all newly-admitted inmates/detainees are transported to SCJ's holding area, it is the jail's practice that all personal property and outer garments, belts, and shoes be surrendered and secured. Id. at ¶ 23. Additionally, a SCJ corrections officer ("CO") conducts an external pat search of the clothed inmate, with, on occasion, the assistance of a hand-held metal detecting wand. Id. A CO also conducts a booking interview of the inmate, including a "pedigree inquiry," suicide screen, and a tattoo inquiry. A CO also fingerprints and photographs the inmate. Id.

The parties agree that newly-admitted male inmates who are going to be housed in one of SCJ's housing units are routinely subjected to, what Defendants term, the "clothing exchange process" (hereinafter "exchange/strip search process"). Id. at ¶ 22. However, Defendants claim that SCJ'S Search Policy expressly states that strip searches and strip frisk searches "shall not be routinely conducted" and only authorizes such searches when reasonable suspicion is present. Id.

2

at ¶¶ 7-8.  Additionally, Defendants state that the exchange/strip search process "is not an official procedure described or defined by any written Policy or Order at the SCJ."  Id. at ¶ 12.  Finally, Defendants assert that "[n]o SCJ Correction Officer has been authorized to conduct any personal searches of newly-admitted inmates during the clothing exchange process in the absence of reasonable suspicion."  Id. at ¶ 13.  Nor, Defendants claim, has any CO been trained to conduct searches without reasonable suspicion.  Id. at ¶ 14.

Defendants state that the exchange/strip search process begins with the CO providing the inmate with a 4-foot towel[1], facility-issued clothing, and other personal care items.  Id. at ¶ 24.  A CO then instructs the inmate, who is separated from the CO by a 42" x 48" masonry half-wall, to undress and place his personal clothes into a mesh bag, which is taken to the SCJ property room.  Id.  The CO then directs the inmate to shower in the semi-private shower stall located in the holding area and to dress in the facility-issued clothing.  Id.  The CO will inspect the inmate's street clothing for potential contraband in the property room, outside of the inmate's view, before having it laundered.  Id.  Defendants state that the exchange/strip search process concludes when "after the inmate has dressed himself, a CO returns to the Holding Area and transports the inmate to a housing unit."  Id.

Plaintiffs dispute this characterization of the exchange/strip search process.  Plaintiffs assert that SCJ does have a written policy governing what they term "a thorough personal search"

---

[1]     Plaintiffs dispute Defendants various representations regarding the size of the towel provided to inmates; they state there is no measurement of the towels in the record, and that Defendants refer to no testimony about the towels' size, shape, or standardization.  Plntfs' Statement of Material Facts (Dkt. No. 72, Attach. 14) at ¶ 6.

and they point to particular sections of SCJ's "Inmate Management" policy in support.  Plntfs'
Statement of Material Facts (Dkt. No. 72, Attach 14) at ¶ 7 (emphasis removed).  One section of
SCJ's policies requires inmates to remove all personal clothes and footwear for washing and
storage.  Id.; see also SCJ Inmate Management Policy (Dkt. No. 72, Attach. 4, Ex. C) at ¶ B(4).
In a separate section of the policy, listed under the Medical Screening Form section, the SCJ
requires that "[a] visual analysis of the inmate will be conducted throughout the admission
process."  Id. at ¶ D.  Plaintiffs argue that these two sections of the written policy read together
cover, though "incompletely," the "strip search to which Plaintiffs were subjected."  Plntfs'
Statement of Material Facts (Dkt. No. 72, Attach. 14) at ¶ 7.

Furthermore, Plaintiffs state that it is Defendants' practice "to strip search all incoming
pre-trial detainees who are not bailed out."  Id.  Plaintiffs state that "[a]lthough not completely
described in any written SCJ policy or order, the 'clothing exchange' process is a common,
repeated practice that defendant Hazzard has authorized and approved."  Id. at ¶ 12 (citing
Hazzard Deposition (Dkt. No. 72, Attach. 5, Ex. D) at 29-30.[2]).  Plaintiffs testified that they were
directed to remove their clothes in front of the COs and away from the half-wall.  See id. at ¶ 24.
Plaintiffs also point to testimony by both current and former SCJ COs that they conducted

---

[2]     During his deposition, Defendant Hazzard described the exchange/strip search as
follows:

> The inmate is told to take his clothes off and the officer stands there with
> the bag and the inmate is told to put the clothes into the bag and he's
> handed the other clothes or he can take the clothes.  And the officer tells
> the inmate to go take a shower and the officer takes the bag into the
> property room.

Hazzard Depositon (Dkt. No. 72, Attach. 5, Ex. D) at 29-30.

4

exchange/strip searches of inmates in front of intake holding cells, also away from the half-wall. Id. Additionally, Plaintiffs note that there is no mention in SCJ's written policies that the half-wall is to be used at all, even for privacy purposes, during the exchange/strip search process. See id. Plaintiffs also state that their testimony and that of Defendants' Rule 30(b)(6) witness, Defendant Hazzard, demonstrates that the CO conducting the exchange/strip search "stand[s] in front of the detainee and hold[s] the bag out for the detainee to place his clothing in." Id. Furthermore, there is testimony in the record that COs do observe inmates removing their

underpants as part of the exchange/strip search process.[3]  See Kenyon Deposition (Dkt. No. 46,

Attach. 11, Ex. H) at 23-25.

### B.    Plaintiffs' Individual Allegations

On September 5, 2003 at approximately 1:00 am, an Officer of the Cobleskill Police

―――――――――――――――――

[3]      Joseph Kenyon, a CO at SCJ since September 8, 2002, has regularly booked new
detainees at SCJ.  The following exchange from Officer  Kenyon's deposition
suggests the nature of the examination conducted by COs during the
exchange/strip search process :

> **Q:**     Is the inmate required to remove his underpants in front of you?
> **A:**     Yes.
> **Q:**     And do you then search the underpants?
> **A:**     Not right there, no.
> **Q:**     You search the underpants at a later time?
> **A:**     Yes.

Kenyon Deposition (Dkt. No. 46, Attach. 11, Ex. H) at 23.

> **Q:**     When you're instructing the inmate to remove their clothing, are
> they given the option of removing their clothing in private and then
> giving you the clothes in the bag?
> > **Mr. Johnson:**     I object to the form of the question.
> > Go ahead.
>
> **A:**     No.
> **Q:**     They are required to stand in front of you and remove their
> clothing?
> > **Mr. Johnson:**     I object to the form of the question.
> > You can answer.
>
> **A:**     Yes.
> **Q:**     Are you facing the inmate as they remove their clothes?
> **A:**     Yes.
> **Q:**     Are you watching the inmate as they remove their clothing?
> **A:**     Yes.

Kenyon Deposition (Dkt. No. 46, Attach. 11, Ex. H) at 24-25.

Department arrested Plaintiff Wright for driving while intoxicated.  Defts' Statement of Material

Facts (Dkt. No. 48) at ¶ 35.  The Cobleskill Police subjected Wright to a pat search, but did not

conduct any other personal searches.  Id. at ¶ 39.  The Cobleskill Police transported Wright to

SCJ at approximately 3:30 am.  Id. at ¶ 40.  Wright was taken to the SCJ's Holding Area, where

after completing the booking procedure, he was subjected to the exchange/strip search process.

Id. at ¶¶ 42, 46-47.

   Defendants state that during the exchange/strip process, Wright did not observe what the

CO did while he undressed.  Id. at ¶ 48.  Plaintiffs deny this and state that Wright did testify that

the CO was standing in front of him as he undressed.  Plntfs' Statement of Material Facts (Dkt.

No. 72, Attach. 14) at ¶ 48.  Moreover, when asked what direction he was facing as he got

undressed, Wright testified that, as best as he could recall, he was "at somewhat of an angle to

[the CO] . . . It was like sort of facing towards the officer."  Wright Dep. (Dkt. No. 50, Ex. J) at

79.  Defendants state that Wright took a shower and used the facility-issued towel provided to

him during and after the shower.  Defts' Statement of Material Facts (Dkt. No. 48) at ¶ 51.

Plaintiffs note that Wright did not use the towel during the shower, but did use it while walking

to the shower and to dry himself off after he finished showering.  Plntfs' Statement of Material

Facts (Dkt. No. 72, Attach. 14) at ¶ 51.  After finishing the shower, and before being transported

to a SCJ housing unit, Wright was alone in the holding area and was allowed to dress himself in

a facility-issued uniform.  Defts' Statement of Material Facts (Dkt. No. 48) at ¶¶  52-53.

   The Albany County Sheriff's Department transported Plaintiff Kelsey from Albany

County Jail, where he works as a CO, to SCJ on or about October 16, 2002.  Id. at ¶ 71; Plntfs'

Response (Dkt. No. 72, Attach. 13) at 2.  Kelsey was arrested for a civil violation of the Family

Court Act after appearing in Family Court on a child support matter.  Plntfs' Response (Dkt. No.

72, Attach. 13) at 2.  Upon his arrival at SCJ, Kelsey was escorted to SCJ's holding area and

subjected to a booking interview; after which he was fingerprinted and required to sign various

forms.  Defts' Statement of Material Facts (Dkt. No. 48) at ¶¶ 73-74.

Before being transported to one of SCJ's housing units, Kelsey was subjected to SCJ's

exchange/strip search process.  Id. at ¶ 76.  Defendants claim that Kelsey was not asked to expose

his buttocks or to expose and manipulate his testicles at any time while he was at SCJ.  Defts'

Statement of Material Facts (Dkt. No. 48) at ¶¶ 88-89.  However, Plaintiffs again dispute this

characterization; they note that Kelsey was ordered to undress while standing in front of a CO,

and, as a result, Kelsey's buttocks and testicles were exposed and viewed by the CO.  Plntfs'

Statement of Material Facts (Dkt. No. 72, Attach. 14) at ¶ 88-89.

## II.      Discussion

### A.      Defendants' Motion for Summary Judgment

Rule 56 of the *Federal Rules of Civil Procedure* provides that summary judgment is

proper when "the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex

Corp. v. Catrett, 477 U.S. 317, 322 (1986).  In applying this standard, courts must "'resolve all

ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party

opposing summary judgment.'" Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001) (quoting

Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001)).

Once the moving party meets its initial burden by demonstrating that no material fact

exists for trial, the nonmovant "must do more than simply show that there is some metaphysical

doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,

586 (1986) (citations omitted).  The nonmovant "must come forth with evidence sufficient to

allow a reasonable jury to find in her favor." Brown, 257 F.3d at 251 (citation omitted).  Bald

assertions or conjecture unsupported by evidence are insufficient to overcome a motion for

summary judgment.  Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991); W. World Ins. Co. v.

Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990).


### 1.      Defendants' Official Liability Pursuant to the Existence of a Policy, Custom, or Practice

Defendants argue that Plaintiffs' claims against Schoharie County and Defendants Bates

and Hazzard, in their official capacities, fail because SCJ does not have any policy, practice, or

custom of conduct that requires personal searches of all newly-admitted inmates.  Defts' Summ.

Judgment Mem. of Law (Dkt. No. 49) at 10.  Pursuant to 42 U.S.C. § 1983, Government

defendants are responsible for constitutional violations inflicted by their employees or agents

when those injuries are the result of the execution of a policy or custom made by lawmakers or

those whose edicts or acts may fairly be said to represent official policy.  See Monell v. Dep't of

Soc. Servs., 436 U.S. 658, 694 (1978).  In support of their assertion, Defendants state that the

plain language of SCJ's policy limits body searches to pat searches and to strip/strip frisk

9

searches when there is reasonable suspicion.  Defts' Summ. Judgment Mem. of Law (Dkt. No.

49) at 11.  Moreover, Defendants assert that "the SCJ Clothing Issuance Policy does not

authorize any inmate searches or inspections of inmates' bodies during clothing exchanges."  Id.

at 12.  Additionally, Defendants argue that the evidence in the record demonstrates that SCJ's

actual practices and procedures do not include inspection of inmates' naked bodies.  Id.

Defendants specifically state that: (1) no policy maker ever authorized inmate

searches/inspections during the exchange/strip search process; and (2) COs were never trained to

conduct searches/inspections of inmates during the exchange/strip search process.  Id.

Furthermore, Defendants state:

> [E]ach and every one of the senior SCJ personnel who frequently conducted
> intakes and/or worked in and around the Holding Area have consistently testified
> that: no inmate searches and inspections were conducted beyond the Pat Search
> upon entry into Holding; the half-wall was used during clothing exchanges;
> inmates were furnished a four-foot bath towel prior to removing their street
> clothes; and inmates were free to position themselves to accommodate any level
> of modesty they felt, if any.

Id. at 13.  Defendants' recitation of the circumstances surrounding the exchange/strip search

implies that inmates are instructed to remove their clothes and may be allowed to use a variety of

means to preserve some privacy, possibly from a CO observing the inmate, such as use of the

half-wall and the facility-issued towel.

As explained above, Plaintiffs counter that sections of SCJ's written "Inmate Processing"

policy require COs to conduct a visual analysis of newly-admitted inmates throughout the

admission process.  Plntfs' Response (Dkt. No. 72, Attach. 13) at 9; Plntfs' Statement of Material

Facts (Dkt. No. 72, Attach. 14) at ¶ 7.  The written policy does in fact require such a visual

10

analysis, and the exchange/strip search process is not explicitly excepted from this mandate.  See SCJ Inmate Management Policy (Dkt. No. 72, Attach. 4, Ex. C) at 6.  Moreover, Plaintiffs have also elicited testimony from Defendant Hazzard suggesting the COs' practices may in fact result in their observing newly-admitted inmates as they disrobe.  See *supra*, Section I.A, at 4.  However, the section of SCJ's policies requiring inmates to remove all personal clothes is in an entirely separate section of the policy from the visual analysis mandate, which is listed under a distinct section listed as the Medical Screening Form section.  SCJ Inmate Management Policy (Dkt. No. 72, Attach. 4, Ex. C) at ¶ D.

The parties appear to agree that inmates are required by written policy or common practice to remove their clothes - both state that SCJ's policies and practices require newly-admitted inmates to do so before being transferred to the jail's housing units.  Nevertheless, there is a dispute between the parties as to whether SCJ's policies and practices, as implemented, require a CO to observe a newly-admitted inmate undress.  Defendants have not met their burden to prove that there is no issue of material fact as to whether SCJ's policies and practices require COs to observe inmates as they remove their street clothes.  However, a question remains: if a CO was required to observe an inmate undress, would this procedure constitute an unreasonable search under the Fourth Amendment to the United States Constitution?

2.    **Exchange/Strip Search Process is an Unreasonable Search For Fourth Amendment Purposes**

i.    **Exchange/Strip Search Process is a Search for Fourth Amendment Purposes**

Defendants argue that the exchange/strip search conducted by SCJ before inmates enter the jail's housing units does not constitute a "search" and, therefore, does not need to comport with the requirements of the Fourth Amendment.  Defts' Summ. Judgment Mem. of Law (Dkt. No. 49) at 13.  Moreover, Defendants submit that the possibility that a CO might observe an inmate while he undresses still does not transform the exchange/strip search into a search under the Fourth Amendment.  Id. at 14.  Defendants argue that a search requires some affirmative act or probing or inspection by public officials and that SCJ's policy and practice regarding the exchange/strip search process do not include any inspection or search of inmates' naked bodies. Id.

Plaintiffs respond that the purpose of the exchange/strip search is to examine newly-arrived inmates for contraband before they are moved to the jail's housing units, and the process must, therefore, be considered a search for Fourth Amendment purposes.  Plntfs' Response (Dkt. No. 72, Attach. 13) at 11.  Plaintiffs suggest that the totality of the exchange/strip search process demonstrates that the purpose is to search the detainee.  Id. at 12.  In support, Plaintiffs point out that Defendants admit that after the detainee's clothing is removed, it is taken into another room and searched for contraband.  Id. (citing Defts' Statement of Material Facts (Dkt. No. 48) at ¶ 24).  Additionally, Plaintiffs note that SCJ's written policies provide that "[c]lothing worn into the jail and all other personal property items will be carefully inspected for

contraband."  Id. (citing SCJ Inmate Management Policy (Dkt. No. 72, Attach. 4, Ex. C) at ¶ E).

Plaintiffs also cite testimony elicited from deposed COs implying that the only reason for the

exchange/strip search is to search for contraband.[4]  Id.  As a consequence, Plaintiffs assert that it

is not credible for Defendants to argue that the CO conducting the exchange/strip search process

is going to avert his eyes from the detainee at the moment (when the inmate is getting undressed)

when the detainee would have to transfer any contraband from his clothes to his naked person

and/or to his facility-issued clothing.  Id. at 13.

       The record strongly suggests that the purpose behind the entire exchange/strip search

process is to search inmates for contraband.  Notwithstanding this likelihood, whatever the

purposes for the exchange/strip search process, the disputed facts reasonably suggest that inmates

are most likely required to disrobe in front of a CO, who probably observed the inmates' bodies.

This Court agrees with Judge Hurd who, in a case similar to the one at bar, stated that the

purpose of the process at issue and the terminology used to describe it "does not change the

observation of a naked admittee to anything other than what it is - a strip search."  Marriott v.

County of Montgomery, 227 F.R.D. 159, 169 (N.D.N.Y. 2005) (Hurd., D.J.), aff'd, No.

_____

[4]      For example, when asked about the purpose of the exchange/strip search process,
       Defendant Hazzard stated:

              A:      The purpose is to - A lot of these people that come off the street are
                      either filthy or - We do it for a health hazard.  This way here, we're
                      sure that they're getting clean clothes.  And that's it, really.
              Q:      Is the purpose also to prevent the introduction of contraband into
                      the facility?
              A:      Well, yes, anything that's in their clothes.

       Hazzard Deposition (Dkt. No. 72, Attach. 5, Ex. D) at 86-87.

05-1590-cv, 2005 U.S. App. LEXIS 25428 (2d Cir. Nov. 22, 2005).

### ii.   Defendants Fail to Meet Burden that Exchange/Strip Search Process is Constitutional Absent Reasonable Suspicion

Defendants assert that if the exchange/strip search process is subject to the Fourth Amendment, it is a reasonable procedure under the balancing analysis conducted in connection with the review of jail procedures promulgated under Bell v. Wolfish, 441 U.S. 520 (1979). Defts' Summ. Judgment Mem. of Law (Dkt. No. 49) at 15-16.  However, in the Second Circuit, the treatment of misdemeanor arrestees being held in jails is governed by Weber v. Dell, 804 F.2d 796 (2d Cir. 1986) and its progeny.  See Shain v. Ellison, 273 F.3d 56, 69 (2d Cir. 2001) (Katzmann, J., concurring).  Consequently, under the relevant Second Circuit precedent, "persons charged with a misdemeanor and remanded to a local correctional facility . . . have a right to be free of a strip search absent reasonable suspicion that they are carrying contraband or weapons." Id. at 66.  Defendants concede that newly-admitted inmates charged with misdemeanors should not be subjected to "highly invasive strip/cavity searches in the absence of  reasonable suspicion."  Defts' Summ. Judgment Mem. of Law (Dkt. No. 49) at 18.  However, Defendants assert that there is no evidence that SCJ employed policies and/or practices that have been specifically prohibited by the Circuit.  Id.

However, a close reading of Second Circuit precedent suggests that the alleged practices at issue have been considered to be unconstitutional.  In Marriott, Judge Hurd considered whether less intrusive inspections rise to the level of unconstitutional conduct and determined

14

that it is unconstitutional for newly-admitted inmates charged with a misdemeanor to be required to remove all of their clothing in the presence of a CO for a visual inspection, without any reasonable suspicion to do so.  See Marriott, 227 F.R.D. at 169-70.  Defendants argue that SCJ's practices are based upon legitimate security interests and that the presence of a CO serves as a deterrent to inmates seeking to destroy or transfer contraband that may be on their person.  Defts' Summ. Judgment Mem. of Law (Dkt. No. 49) at 22.  If this admission is accurate, it can mean only one thing: that the exchange/strip search process is meant to serve as a search for contraband - even when there is no reasonable suspicion to do so.  The Circuit has explicitly held that, without particularized suspicion, the risk that a misdemeanor arrestee will introduce contraband into the general jail population does not warrant a strip search of all arrestees.  Walsh v. Franco, 849 F.2d 66, 69 (2d Cir. 1988).  Accordingly, this Court cannot grant summary judgment to the Defendants while there is credible conflicting evidence in the record regarding the nature of the CO's observation of inmates as they disrobe.

### 3.    Individual Liability of Defendants Bates and Hazzard

Government officials can be sued in their individual capacities under 42 U.S.C. § 1983. Hafer v. Melo, 502 U.S. 21, 31 (1991).  Bates and Hazzard must have been personally involved in the alleged constitutional deprivations in order for Plaintiffs to receive damages from them under § 1983.  Williams v. Smith, 781. F.2d 319, 323 (2d Cir. 1986).  Personal involvement can mean that Bates and Hazzard either: (1) directly participated in the infraction; (2) failed to remedy the wrong after learning of the violation; (3) created and/or allowed unconstitutional

policies or customs to continue; or (4) were grossly negligent in managing subordinates who caused the violation. Id. at 323-24. Defendant Bates has been Sheriff of Schoharie County since January, 1998. Bates Aff. (Dkt. No. 50) at ¶ 1. In that capacity, Bates reviews and approves all SCSD policies before they are adopted and implemented. Id. at ¶ 3. Defendant Hazzard, as SCJ's Administrator, oversees written policies and procedures at the jail. Hazzard Aff. (Dkt. No. 50) at ¶¶ 1, 4. Moreover, both Defendants Bates and Hazzard admit to being responsible for developing and implementing training programs at SCJ. Defts' Summ. Judgment Mem. of Law (Dkt. No. 49) at 26 (citing, *inter alia*, Bates Aff. (Dkt. No. 50) at ¶ 7; Hazzard Aff. (Dkt. No. 50) at ¶¶ 19-24.). As a consequence of their involvement in the maintenance of SCJ's policies and practices, Defendants Bates and Hazzard are amenable to suit in their individual capacities.

The Court also dismisses Defendants Bates's and Hazzard's claims that they are entitled to qualified immunity. Defts' Summ. Judgment Mem. of Law (Dkt. No. 49) at 27-28. There remains a dispute regarding material facts related to the constitutionality of the exchange/strip search process. As a result, it would be premature to determine whether Defendants Bates and Hazzard are responsible for violating clearly established constitutional law or are immune from suit under the qualified immunity doctrine. Defendants Bates and Hazzard may renew their defense at the proper time.

### B.      Plaintiffs' Motion for Class Certification

Plaintiffs seek class action certification pursuant to Rule 23(b)(2) of the *Federal Rules of Civil Procedure* as an injunctive relief class action, or in the alternative Rule 23(b)(3) as a money

damages class action. Plntfs' Class Cert. Mem. (Dkt. No. 46, Attach. 2) at 5.  Before a class can

be certified under one of the provisions of Rule 23(b), Plaintiffs must satisfy the prerequisites of

Rule 23(a).  See FED. R. CIV. P 23(a) & (b).

### 1.       FRCP 23(a) Prerequisites

There are four prerequisites for class certification under Rule 23(a): "(1) numerosity (a

'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of

law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical . .

. of the class'); and (4) adequacy of representation (representatives 'will fairly and adequately

protect the interests of the class')."  Amchem Prods. v. Windsor, 521 U.S. 591, 613 (1997)

(quoting FED. R. CIV. P 23(a)).  Plaintiffs bear the burden of demonstrating that the prerequisites

exist in the case.  See Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir. 1999)

While the Court will undertake a rigorous analysis to determine if the prerequisites have been

satisfied, a motion for class certification does not require the Court to consider the merits of the

case.  Id.  As set forth in the Complaint, the proposed class is defined as:

> All persons in the United States who have been or will be placed into the
> custody of the Schoharie County Jail after being charged with
> misdemeanors, violations or held on civil matters and were or will be strip
> searched upon their entry into the Schoharie County Jail pursuant to the
> policy, custom and practice of the Schoharie County Sheriff's Department
> and the County of Schoharie.  The class period commences on March 19,
> 2001, and extends to the date on which the Schoharie County Sheriff's
> Department and/or the County of Schoharie are enjoined from, or otherwise
> cease, enforcing their unconstitutional policy, practice and custom of
> conducting strip searches absent reasonable suspicion.

Compl. (Dkt. No. 1) at ¶ 9.

**Numerosity:**  The numerosity requirement found in Rule 23(a)(1) mandates that the

prospective class be so large that joinder of all members is "impracticable," but this does not

mean that joinder has to be impossible for a class to be certified.  Deflumer v. Overton, 176

F.R.D. 55, 58 (N.D.N.Y. 1997) (McAvoy, C.J.) (quoting Robidoux v. Celani, 987 F.2d 931, 935

(2d Cir. 1993)).  Plaintiffs do not have to determine the precise number of potential class

members, but to show that joinder is impractical Plaintiffs must show some evidence supporting

a reasonable estimate of the number of potential class members.  Id.

During discovery, Plaintiffs requested from Defendants all inmate admission records for

pre-trial detainees charged with misdemeanors, violations, violations of parole, violations of

probation, or held on civil or family court matters.  See Rozger Aff. in Support of Class Cert.

(Dkt. No. 46, Attach. 3) at ¶ 2; Plntfs' Class Cert. Mem. (Dkt. No. 46, Attach. 2) at 7; Plntfs'

Reply Class Cert. Mem. (Dkt. No. 75, Attach. 6) at 12.  In response to this request, Defendants

produced booking sheets for approximately 1,300 individuals.  Id.  Defendants assert that only

forty-five percent (45%) of the inmates reflected in the records disclosed to Plaintiffs were not

facing felony charges and likely exchanged clothing.[5]  Defts' Response Mem. to Class Cert. (Dkt.

---

[5] Defendant Hazzard submitted an affidavit in support of Defendants' Response to
Class Certification in which he explained that SCJ's records provided to Plaintiffs
do not reflect the criminal charges and do not indicate which inmates completed
the exchange/strip search process.  Hazzard Aff. (Dkt. No. 71, Attach. 6) at ¶ 6.
Instead of assuming that all non-felony admittees completed the exchange/strip
search process, Hazzard's research indicated that approximately twelve percent
(12%) of admittees were female and twelve percent (12%) were bailed out shortly
after intake, and neither group would have been directed to remove their street
clothes.  Id.  Additionally, approximately another thirty-two percent (32%) of
admittees were male felons and, therefore, not part of the prospective class.  Id.
Excluding these three categories of inmates, Hazzard determined that forty-five
percent (45%) of the inmates processed at the SCJ probably completed the

No. 71, Attach. 7) at 19.  Even if the Court assumes that Defendants are correct, that would mean that approximately 585 individuals would be potential class members - a significant number of parties to join in one action without certifying a class.  Therefore, Plaintiffs have sufficiently met their burden with respect to the numerosity requirement.

**Commonality:**  The commonality and typicality requirements tend to merge into one another because both seek to ensure that named plaintiffs' claims and the class's claims are interrelated.  Marisol A. by Forbes v. Giuliani, 126 F.3d 372, 376 (2d Cir. 1997).  To sustain the commonality requirement, Plaintiffs must show that each class member's claim shares a common question of law or fact.  Id.  Defendants claim that Plaintiffs' challenge of the exchange/strip search process turns on a fact-intensive evaluation of each inmate's particular experiences.  Defts' Response Mem. to Class Cert. (Dkt. No. 71, Attach. 7) at 10.  Defendants explain that Plaintiffs' exchange/strip search experiences were not done in accordance with SCJ's policies and practices, which means that there is no common set of facts or law that can govern their cases and those of any proposed class.  See id. at 10-11.  Moreover, Defendants distinguish the present case from other cases where courts certified classes of non-felony inmates subjected to some type of strip search.  Id.  According to Defendants, in the previous cases, the constitutionality of official procedures requiring strip searching all new intakes was at issue, while in the instant case no strip searches were authorized by written policies or practices and no members of the potential

exchange/strip search process.

19

class were searched, inspected, or even observed in a state of undress.  See id.  However, as discussed *supra*, in Section II.A, the constitutionality of SCJ's policies and practices remains to be determined and, which Plaintiffs correctly note, is the overriding common issue of both fact and law.

**Typicality:** The typicality requirement is the other side of the coin: the claims of the class representatives must be typical of those of the class, which is satisfied when each class member's claim arises from the same course of events, and each class member will make similar arguments to prove a defendant's liability.  Marisol A., 126 F.3d at 376.  However, the claims of the named plaintiffs do not need to be identical to that of each class member's claims.  Marriott, 227 F.R.D. at 172 (citing McNeill v. New York City Hous. Auth., 719 F. Supp. 233, 252 (S.D.N.Y. 1989)).  As explained in the preceding paragraph, Plaintiffs Kelsey and Wright challenge SCJ's policies and practices and not just the particulars of their individual exchange/strip search at SCJ.  Moreover, this suit does not simply challenge the manner of the process and Plaintiffs access to a particular type of towel, but, instead, focuses on the possibility that, pursuant to SCJ's policies and practices, non-felon inmates were forced to remove their clothes under the gaze of a CO for no good reason.  Despite potentially small variations between Plaintiffs Kelsey's and Wright's experiences and those of potential class members, all potential class members would essentially argue the same facts and law.  As a consequence, the typicality requirement is met.

**Adequacy of Representation:** Rule 23(a)(4) requires that plaintiffs demonstrate that the proposed action will fairly and adequately protect the interests of the class. FED. R. CIV. P 23(a)(4). In order to determine whether class representatives meet this standard, courts consider several factors, including: (1) the representatives' understanding and involvement in the lawsuit; (2) their willingness to pursue the litigation; and (3) any conflict of interest between the representatives and other members of the class. See Parker v. Time Warner Entm't Co., L.P., 98-CV-4265, 2007 U.S. Dist. LEXIS 5838, at *38 (E.D.N.Y. January 25, 2007); Marisol A., 126 F.3d at 378. Defendants argue that Plaintiffs have a conflict of interest and cannot adequately represent members of the proposed class. Defts' Response Mem. to Class Cert. (Dkt. No. 71, Attach. 7) at 16-17. Defendants claim that under this Court's prior ruling, the statutory limitation on money damages prescribed under the Prison Litigation Reform Act ("PLRA") applies to individuals incarcerated on the March 19, 2004 commencement date, but does not bar Plaintiffs' claims, in which money damages allegedly predominate, because they were not prisoners the date this action was commenced. Id. at 17-18. Defendants also assert that the allegations made by Plaintiffs are different from the experiences of individuals who completed the exchange/strip search process and, therefore, "mini-trials on liability and damages for each class plaintiff" would be required. Id. at 18.

In essence, Defendants argue that Plaintiffs' claims are not typical of the class because of the nature of the exchange/strip search as they experienced it. However, as discussed above, the facts of SCJ's practices and policy are disputed and the overwhelming issue is whether the general practices, not simply those as applied to Plaintiffs, are constitutional. Therefore, there is

no conflict between Plaintiffs' claims and those of a potential class. See Marriott, 227 F.R.D. at 172.

The Court finds that Defendants PLRA issue is not relevant to whether Plaintiffs will adequately represent the class. First, §1997e(e) of the PLRA states that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e) (2001). The requirement that a prisoner show physical injury before bringing an action only applies to damages and, as a result, does not apply to requests for declaratory or injunctive relief to end an allegedly unconstitutional condition of confinement. See Khalil Abdur Rahim v. Sheahan, No. 99 C 0395, 2001 U.S. Dist. LEXIS 17214, at *27 (N.D. Ill. Oct. 19, 2001) (quoting Herman v. Holiday, 238 F. 3d 660, 665 (5th Cir. 2001) (citing Helling v. McKinney, 509 U.S. 25, 34 (1993))). Moreover, §1997e(e) only precludes recovery of compensatory damages absent a showing of physical injury; when a violation under § 1983 has been found, nominal and punitive damages remain available whether prisoners have met the physical injury requirement or not. Thompson v. Carter, 284 F.3d 411, 416 (2d Cir. 2002) ("Because Section 1997e(e) is a limitation on recovery of damages for mental and emotional injury in the absence of a showing of physical injury, it does not restrict a plaintiff's ability to recover compensatory damages for actual injury, nominal or punitive damages, or injunctive and declaratory relief.") At the very least, without the need to show any physical injury, members of the class who were incarcerated when this action was filed are still entitled to injunctive relief and nominal and punitive damages.

Moreover, §1997e(e) states that no action "may be brought by a prisoner."  42 U.S.C. § 1997e(e) (2001).  Courts have found that this language limits the application of the physical injury requirement to claims filed or commenced by prisoners currently in custody.  See Harris v. Garner, 216 F.3d 970, 974-76 (11th Cir. 2000).  In the case at bar, Plaintiffs commenced the action after their incarceration and a prior Order of this Court found that §1997e(e) limitations did not apply to them.  Mem.-Decision & Order (Dkt. No. 65).  It follows that no other potential class members commenced this suit, although they may join the class.  The language of §1997e(e) requires a showing of physical injury only in suits brought, *i.e.* commenced or filed, by prisoners, not those in which they join as members of a class action.

Prior to the 2003 Amendments to Rule 23, the adequacy of class counsel was also evaluated under Rule 23(a)(4).  Parker, 2007 U.S. Dist. LEXIS 5838, at *38.  However, evaluation of counsel is now properly considered under Rule 23(g).[6]  Id.  Plaintiffs' attorneys have demonstrated that they are able to represent the class in this litigation.  Defendants argue that Plaintiffs' counsel cannot represent the class because of the differences between Plaintiffs'

---

[6]      FRCP 23(g)(1) states in pertinent part:

(B)      An attorney appointed to serve as class counsel must fairly and adequately
         represent the interests of the class.
(C)      In appointing class counsel, the court
         (i) must consider:
                • the work counsel has done in identifying or investigating
                potential claims in the action,
                • counsel's experience in handling class actions, other complex
                litigation, and claims of the type asserted in the action,
                • the resources counsel will commit to representing the class;

FED. R. CIV. P. 23(g)(1)

and the class's claims.  Defts' Response Mem. to Class Cert. (Dkt. No. 71, Attach. 7) at 16.  The

Court has found that Plaintiffs' claims and the class's claims are substantially similar, therefore,

Plaintiffs counsel can adequately represent the interests of the class under Rule 23(g)(1)(B)

because there is no inherent conflict in Plaintiffs' counsel being named as counsel for the class.

Defendants also suggest that Plaintiffs' counsel have not displayed the required diligence

in prosecuting this action because of their failure to respond to discovery demands in a timely

manner.  Id. at 15-16.  A review of Plaintiffs' response and the docket reveals that this discovery

dispute is no more than normal posturing common in any litigation and there is no suggestion in

the record that Plaintiffs' counsel has not pursued the case at bar with anything but diligence.

Moreover, Plaintiffs' counsel has adequately demonstrated their work in pursuing this claim and

their experience for purposes of this Court's consideration pursuant to Rule 23(g)(C).  Plaintiffs'

counsel states that they have taken over ten (10) depositions, filed a timely class certification

motion, responded to Defendants' summary judgment motion, and taken proof to show that

SCJ's policies are unconstitutional.  Plntfs' Reply Class Cert. Mem. (Dkt. No. 75, Attach. 6) at

11.  This work represents a significant amount of effort and the commitment of a correspondingly

significant amount of  resources.  Plaintiffs' counsel also have significant experience handling

class actions and § 1983 civil rights cases.  See Plntfs' Class Cert. Mem. (Dkt. No. 46, Attach. 2)

at 9-10.  Accordingly, Plaintiffs' counsel is qualified, experienced, and generally able to conduct

the ligation.

Plaintiffs have met their burden and have demonstrated that Rule 23(a)'s prerequisites

exist in this case.  However, in order to certify the class, the Court must next consider whether

Plaintiffs have also met the requirements under Rule 23(b).

### 2.        Rule 23(b) Requirements

#### i.        Rule 23(b)(3) Money Damages Class

In order to certify a class under Rule 23(b)(3), Plaintiffs must establish that common

questions predominate over questions affecting individual plaintiffs and that class resolution is

the best means of adjudicating the case.  Amchem, 521 U.S. at 615.  The predominance

requirement is more demanding than the commonality requirement in Rule 23(a): Plaintiffs must

show that the case is subject to generalized proof applicable to the class as a whole.  Wal-Mart

Stores, Inc. v. Visa USA Inc. (In re Visa Check/Mastermoney Antitrust Litig.), 280 F.3d 124, 136

(2d Cir. 2001).  In order to determine whether general proof predominates, courts must determine

that the issues subject to generalized proof outweigh those issues that are subject to

individualized proof.  See Augustin v. Jablonsky (In re Nassau County Strip Search Cases), 461

F.3d 219, 227-28 (2d Cir. 2006) (quoting Heerwagen v. Clear Channel Commc'ns, 435 F.3d 219,

226 (2d Cir 2006)).  As in Augustin, the class definition at issue here includes all non-felony

inmates who "were or will be strip searched upon their entry into the Schoharie County Jail

pursuant to the policy, custom and practice."  Augustin, 461 F.3d at 228.  Therefore, the question,

as noted above, is whether the policy and practices existed and whether they were

unconstitutional - questions common to all potential class members.  Moreover, the existence of

defenses in connection with individual plaintiffs, such as the conduct of a strip search based on

contemporaneously held suspicion, does not foreclose certification because such an inquiry will

only be sought against a limited number of plaintiffs.  See Augustin, 461 F.3d at 229-30.

Additionally, Plaintiffs meet the second requirement under Rule 23(b)(3) because a class action would be the fairest and most efficient method of resolving the case.  Courts consider four nonexclusive factors when analyzing this question: (1) the interest of the class members in maintaining separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action.  Id. at 230.  The type of violations that the newly-admitted inmates were accused of and the generally brief nature of their detention creates a reason to believe that prospective members of the class may not know that they suffered a violation of their constitutional rights in the absence of notification of the class action.  Moreover, this action has already progressed and offers the possibility that one action can efficiently determine SCJ's liability.  See id.  Therefore, a class action is the most efficient manner in which to proceed and certification under Rule 23(b)(3) is appropriate.

Questions related to the determination of damages due to the manner in which damages should be calculated for individual plaintiffs should not be the sole reason for denying class certification.  See Visa Check, 280 F.3d at 140.  The mechanism for determining individual damages does not need to be decided in order for the Court to certify the class.

ii.        **FRCP 23(b)(2) Injunctive Class**

Rule 23(b)(2) allows class certification when "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2).  This type of class action is "intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury." Robinson v. Metro-North Commuter R.R., 267 F.3d 147, 162 (2d Cir. 2001).  When plaintiffs seek certification under Rule 23(b)(2) and money damages, a court must assess the relative importance of the remedies sought and grant certification if the value of the injunctive or declaratory relief is predominant and class treatment is efficient.  Id. at 164.  To determine if injunctive relief predominates, courts should consider: (1) whether reasonable plaintiffs would bring the suit to obtain injunctive relief only; and (2) injunctive relief would be both reasonably necessary and appropriate if plaintiffs succeed.  Id.

Defendants argue that certification under Rule 23(b)(2) is inappropriate because Plaintiffs do not have standing to seek an injunction.  Defts' Response Mem. to Class Cert. (Dkt. No. 71, Attach. 7) at 25-26.  Defendants additionally argue that injunctive relief does not predominate under the Second Circuit's *ad hoc* balancing test, because Plaintiffs would not benefit from seeking an injunction and would not maintain this action if monetary relief were unavailable.  Id. However, this Court does not read the language of the rule and that of the *ad hoc* test to be a subjective analysis of the actions of individual plaintiffs seeking to be named as class representatives.  Instead, the *ad hoc* test seeks to determine whether "reasonable plaintiffs," not

the particular plaintiffs at issue, would bring the action absent monetary recovery. Moreover, the language of the rule does not state that plaintiffs must have standing to seek an injunction. Instead, Rule 23(b)(2) simply seeks to determine whether broad relief is necessary to redress group-wide injury.

In the instant case, SCJ's alleged policies and practices require all non-felony inmates transferred to housing units to be stripped searched. A reasonable plaintiff, potentially subject to such a policy on a repeated basis, would undoubtedly maintain an action that prevented him from being subjected to a potential humiliating practice - even in the absence of monetary recovery. Broad relief may be necessary to enjoin SCJ, and it is appropriate to certify the class under Rule 23(b)(2).

Additionally, having assessed the nature of the relief sought, the Court certifies a class seeking both equitable relief and damages.

### III.    Conclusion

Accordingly, it is hereby

**ORDERED**, that Defendants' Motion for summary judgment (Dkt. No. 47) is **DENIED**; and it is further

**ORDERED**, that Plaintiffs' Motion for class certification (Dkt. No. 46) is **GRANTED**; and it is further

**ORDERED**, that Plaintiffs' certified class is defined as follows:

All persons in the United States who have been or will be placed into the custody of the Schoharie County Jail after being charged with misdemeanors,

28

violations or held on civil matters and were or will be strip searched upon their entry into the Schoharie County Jail pursuant to the policy, custom and practice of the Schoharie County Sheriff's Department and the County of Schoharie. The class period commences on March 19, 2001, and extends to the date on which the Schoharie County Sheriff's Department and/or the County of Schoharie are enjoined from, or otherwise cease, enforcing their unconstitutional policy, practice and custom of conducting strip searches absent reasonable suspicion;

and it is futher

**ORDERED**, that the Clerk serve a copy of this Order on all parties by regular mail.

**IT IS SO ORDERED.**

DATED:        February 21, 2007
              Albany, New York



_____
Lawrence E. Kahn
U.S. District Judge